654 So.2d 952 (1995)
Nicholas CORREIA, Appellant,
v.
STATE of Florida, Appellee.
No. 93-2815.
District Court of Appeal of Florida, Fourth District.
April 5, 1995.
Rehearing Denied May 9, 1995.
Richard L. Jorandby, Public Defender, Eric M. Cumfer and Margaret Good-Earnest, *953 Asst. Public Defenders, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Melynda L. Melear, Asst. Atty. Gen., West Palm Beach, for appellee.
PARIENTE, Judge.
We reverse appellant's (defendant's) conviction for aggravated assault with a firearm because of the improper admission of extrinsic evidence introduced solely for impeachment on collateral matters relating to facts brought out on cross-examination of defendant's alibi witness.
The incident occurred while the victim was waiting for one of his friends to return with a spare tire, after the vehicle in which he and a group of his friends were riding got a flat tire. The victim testified that while the group was waiting, a maroon Mercury Cougar drove by and the occupants of that car began yelling at and threatening the victim and his friends. According to the victim, the driver of the Cougar made a U-turn, parked in the school parking lot adjacent to where the victim and his friends were waiting with their car and exited the car. Two of the occupants began walking toward the victim and one of the occupants, identified by the victim as defendant, pulled a gun from the trunk of the Cougar and pointed the gun at the victim. The victim testified that, as he ran away, he heard two gunshots, at least one of which was in his general direction.
None of the other occupants of either vehicle testified at trial. There was one eyewitness to the shooting who substantiated the victim's version of what occurred, but who could not identify defendant as the perpetrator. The deputy sheriff who responded to the shooting testified that he inspected the area where the gun was allegedly fired and found no shells on the ground or bullet holes in the exterior of the vehicle. In fact, no physical evidence of a shooting was ever found during the course of the investigation.
Appellant testified in his own defense. His version of the relationship between the victim and himself was that the accusation was a set up; that while the victim and he had been friends in high school, they were now enemies and in fact had been involved in a couple of fights. The victim, however, denied any animus existed. Defendant's defense also centered on an alibi, which was that he was sick at home at the time of the shooting.
Nancy Ericksen, a friend of defendant's mother and a nurse who was out of work because of a back injury, testified that defendant was sick in bed on the day of the incident. She testified that she arrived at defendant's home at about noon that day and was there until approximately 5:30 p.m. She stated that nothing out of the ordinary occurred that day and that she and defendant's mother passed the afternoon "snacking and eating and watching TV and talking." She further recalled that defendant stayed in bed most of the day and that "he didn't look real good." She took his temperature, which was 101 degrees, gave him a couple of Tylenol and told him to lay down and rest because it looked like he might have the flu. She was surprised when she received a phone call from defendant's mother that evening telling her that defendant had been arrested because she knew defendant had been sick at home all day.
On cross-examination the state extensively questioned Ericksen about details of her testimony concerning what she was watching on TV, where she administered the Tylenol and whether anyone else had stopped by defendant's home that day. The state also used a prior deposition of Ericksen for impeachment purposes. In an earlier deposition, Ericksen had been asked what movie she and defendant's mother were watching the day of the incident, and she had responded "I don't know, she's got cable." However, on cross-examination at trial, Ericksen stated that she did not remember if she was watching cable television at defendant's home.
The state requested the opportunity to present rebuttal testimony from defendant's mother and the records custodian of TCI of South Florida (the cable company). It asserted that it was presenting defendant's mother to contradict particular statements in Ericksen's testimony, specifically, where she gave defendant the Tylenol and who else was in the house that day and that it was presenting the cable company records custodian's *954 testimony to show that there was no cable service to defendant's home on the date of the incident. The trial court allowed the testimony, finding it material to the credibility of defendant's alibi.
Defendant asserts the trial court erred in allowing the state to call defendant's mother and the cable company records custodian to contradict the testimony offered by Ericksen, defendant's alibi witness, which contradictions were brought out on cross-examination and were not material aspects of defendant's alibi defense. According to defendant, the witnesses were used to impeach Ericksen on immaterial collateral issues, such as where Ericksen tended to defendant, who was in the home, and whether Ericksen and defendant's mother were watching cable television.
The state argues the inconsistencies in Ericksen's testimony are relevant to the credibility of defendant's alibi, as found by the trial court. Taken to the logical extreme, all details of an alibi defense could be subject to impeachment by extrinsic evidence whether or not the detail is a critical aspect of the alibi witness's testimony. This exception would eviscerate the evidentiary prohibition in cases involving alibi defenses, a position without precedent.
In determining if the issue is collateral so that collateral impeachment by extrinsic evidence is disallowed, the question to be posed is whether the impeaching evidence would be admissible for any purpose other than contradiction. Dempsey v. Shell Oil Co., 589 So.2d 373, 377 (Fla. 4th DCA 1991). Two types of evidence pass this test: 1) evidence which is relevant to independently prove a material fact or issue; and, 2) evidence which would discredit a witness by pointing out the witness's bias, corruption or lack of competency. Id. The state argues that the evidence in this case is admissible under the second prong. However, we reject both bases for admitting the extrinsic impeachment evidence.
Minor discrepancies in a witness's testimony or between witnesses can be expected in all cases, especially if the testimony is not manufactured by the witnesses. There is a distinction between the wide discretion allowed in cross-examination of a witness on collateral matters and the much more limited discretion afforded to impeachment by extrinsic evidence on matters inquired into on cross-examination. When Ericksen took the stand to give testimony supporting defendant's alibi, she put her credibility in issue, and wide latitude was properly given during cross-examination to test the details of the alibi. See Holmes v. State, 565 So.2d 824 (Fla. 4th DCA 1990), review denied, 576 So.2d 287 (Fla. 1991). Obviously, the state is allowed to delve into all matters which "may modify, supplement, contradict, rebut or make clearer the facts testified to in chief... ." Dempsey, 589 So.2d at 378 (quoting Zerquera v. State, 549 So.2d 189, 192 (Fla. 1989) (quoting Coxwell v. State, 361 So.2d 148, 151 (Fla. 1978) (quoting Coco v. State, 62 So.2d 892, 895 (Fla. 1953) (quoting 58 Am.Jur.Witnesses § 632 at 352 (1948))))) (footnote omitted).
The state properly cross-examined Ericksen on the details of where she administered the medicine to defendant, who was present in the house throughout the day and whether she was watching cable television. The state properly used Ericksen's prior deposition for impeachment. However, not all of these details comprised material parts of defendant's alibi defense and therefore, the trial court erred in allowing the state to present rebuttal evidence in the form of the testimony of other witnesses. See § 90.608(5), Fla. Stat. (1991).
Notwithstanding the collateral impeachment on the details of where Ericksen administered the medicine to defendant and who was present in the house throughout the day, we find the collateral impeachment on the cable television issue to be most illuminating of the problems which arise by allowing extrinsic impeachment of collateral matters. Ericksen, who is a nurse, as well as a friend of defendant's mother, testified on direct examination that she was watching television at defendant's home on the day of the incident. During her cross-examination, the state asked whether it was specifically cable television that she was watching. Ericksen replied that she was unable to remember. The state then impeached her with a prior *955 inconsistent statement from her deposition where she had responded to a question about what movie she was watching that day by testifying, "I don't know, she's got cable." To further impeach Ericksen, the trial court allowed the records custodian of the cable television company to testify in rebuttal that there was no record of cable service to defendant's home at the time in question.
Notwithstanding the fact that there could be ways that the household received cable other than paying for the service, the cable television issue became a main feature of the state's case as evidenced by emphasis on this collateral detail in closing argument. We further note that this rebuttal evidence of the records custodian was not only potentially irrelevant, but in actuality, constituted impeachment of Ericksen's deposition testimony, which itself was introduced as impeachment by prior inconsistent statement.
The issue of watching cable television was not a material part of Ericksen's testimony supporting defendant's alibi. Ericksen did not testify on direct examination that the reason she remembered being at defendant's house on the day in question was because she was watching a particular movie shown on cable television. The state made the cable television an issue by its cross-examination. After establishing a minor discrepancy between Ericksen's testimony on cross-examination and her prior deposition testimony, the state was then allowed to make the discrepancy a material part of its attack on the alibi through the introduction of the testimony of rebuttal witnesses.
It is well-established that if a party cross-examines a witness concerning a collateral matter, the cross-examiner must "take" the answer, is bound by it, and may not subsequently impeach the witness by introducing extrinsic evidence to contradict the witness on that point. See Caruso v. State, 645 So.2d 389 (Fla. 1994) and cases cited therein; see generally Charles W. Ehrhardt, Florida Evidence § 608.1 (1993 ed.). The fifth district explained the general principles behind the evidentiary prohibition in Gelabert v. State:
Since the right to ask any particular question on cross-examination when it relates to a collateral matter is normally within the discretion of the trial court, any denial of an objection to the question normally is not considered so prejudicial as to require reversal. However, when a question, posed on cross-examination, relates only to a matter collateral and non-material to any issue at trial, the witness' answer to the question is deemed conclusive. Consequently, the witness cannot be impeached with regard to this testimony by any of the normal means of subsequent impeachment, including contradiction testimony by another witness. Although stated various ways, this general evidentiary philosophy of exclusion has been a part of Florida jurisprudence for many years. Thus, it has been said:
But the answer of a witness on cross-examination respecting any fact irrelevant to the issue will be conclusive, and no such question can be put on cross-examination merely for the purpose of impeaching his credit by contradicting him. Stewart v. State, 42 Fla. 591, 28 So. 815, 816 (1900) (footnote omitted).
The reasoning behind the rule has been attributed to the evidentiary philosophy that a party cannot impeach his own witness and when the question is outside the scope of direct examination and on a collateral matter, the cross-examiner adopts the witness as his own. (footnote omitted). However, commentators prefer to attribute the basis to substantial policy considerations: unfair surprise, undue prejudice, confusion of the issues, and finally, time wasting and its adverse effect on judicial economy. (footnote omitted)... .
407 So.2d 1007, 1009 (Fla. 5th DCA 1981).
We disagree with the dissent's reliance on Jackson v. State, 522 So.2d 802 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 153 (1988), as authority that minor details of an alibi may be used to discredit an alibi. In Jackson, the issue was not the proper method by which to impeach alibi witnesses, but whether the trial court erred in allowing the arresting detective to testify that defendant did not put forth an alibi defense at the time of his arrest. In performing a harmless error analysis, the supreme *956 court noted that the alibi witnesses were not credible and that their testimony had been discredited. At trial the alibi witnesses affirmatively testified that the reason they remembered that a dinner party had taken place on the date of the incident was because of an upcoming birthday. At the depositions of the alibi witnesses, when asked how they could remember the date, none ever mentioned the upcoming birthday. The supreme court noted that "the prosecution brought out discrepancies in the testimony of the alibi witnesses regarding what food was served and what events took place." Jackson, 522 So.2d at 807. Nowhere in the opinion is it suggested that impeachment occurred other than through cross-examination and through prior inconsistent deposition testimony. Even so, the witnesses themselves made the reason for recollecting the date a material part of their direct testimony.
Nowhere in the opinion is it suggested that it would have been permissible, for example, to not only cross-examine the alibi witnesses on what they had for dessert, and in response to an answer that they did not recall, read into evidence their deposition testimony that they had ice cream for dessert, but then also allow the state to call the caterer in rebuttal to testify that only yogurt was served for dessert, not ice cream. By analogy, that is what effectively occurred in this case by allowing the rebuttal witnesses.
Admission of the rebuttal testimony from the cable television records custodian and from defendant's mother was not harmless. The independent evidence of defendant's guilt was not overwhelming. Although the victim of the assault positively identified defendant as the person who pointed the gun at him, defendant testified to animosity between himself and the victim, which could have given the victim a reason to lie about the identity of the person with the gun. No eyewitness identified defendant as the perpetrator. The only witness to the shooting could not identify defendant as the assailant.
Defendant put forth a credible alibi defense. The only positive evidence of his guilt was the victim's identification of him, which defendant asserted was fabricated. Defendant's alibi defense depended on the credibility of his testimony, and that of Ericksen. See Davis v. State, 493 So.2d 11 (Fla. 3d DCA 1986). Given these circumstances, it cannot be said that the errors in this case were harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
The cable television issue became a trial within a trial. During closing argument, defendant's attorney was forced to devote precious time to refuting the cable television issue as well as other non-material contradictions in the alibi witness's testimony. Receipt of this evidence, and the emphasis placed on it by the state, is a classic example of the reason for disallowing extrinsic impeachment of collateral matters.
Because of our reversal on this point, we do not reach the other issues raised on appeal, most of which should not arise on retrial. However, because the case will be retried, we do agree that on retrial the state should not be permitted to inquire into defendant's prior record involving firearms. See Gelabert v. State, 407 So.2d 1007 (Fla. 5th DCA 1981).
REVERSED AND REMANDED.
KROLL, KATHLEEN J., Associate Judge, concurs.
GLICKSTEIN, J., dissents with opinion.
GLICKSTEIN, Judge, dissenting.
I respectfully dissent. I agree that the test to determine whether the issue is collateral is whether the impeaching evidence would be admissible for any purpose other than the contradiction, and that two types of evidence pass this test: (1) evidence relevant to independently prove a material fact or issue, and (2) evidence which would discredit a witness by pointing out the witness' bias, corruption, or lack of competency. Dempsey v. Shell Oil Co., 589 So.2d 373 (Fla. 4th DCA 1991). I disagree with the majority's position that the evidence at issue is not relevant to a material issue in this case. It is relevant to the credibility of appellant's alibi and his alibi witness.
Appellant asserts details such as whether the home had cable, where Ericksen administered *957 medicine to appellant, and who was at the home that day are collateral to whether appellant was at home at the time of the shooting. However, these details are parts of the sum of a material issue  appellant's alibi. They are not wholly unrelated to any issue in the case. Contrast this with Dempsey where the trial court allowed rebuttal testimony to show Dempsey lied about never being fired from a job. Because no claim for lost wages or impaired earning capacity had been made, this court held that the evidence was collateral and should not have been used to suggest Dempsey lied about other matters relevant to the case. Id. at 377-78. See also Gelabert v. State, 407 So.2d 1007 (Fla. 5th DCA 1981) (whether defendant had ever threatened his son with a knife in the past was collateral where he was charged with threatening a deputy with a knife).
In the instant case, the details of the day were made relevant by appellant's use of an alibi defense, and the presentation of evidence to explain why Ericksen was at the house, and how she knew appellant was there as well. The Florida Supreme Court, in Jackson v. State, 522 So.2d 802 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 153 (1988), recognized that inconsistencies in seemingly minor details of an alibi could discredit the alibi. In Jackson, impermissible testimony put before the jury the fact that Jackson had not offered any plausible alibi at the time of his arrest. Jackson, 522 So.2d at 807. In holding that the error was harmless, the court stated that inconsistencies, such as what food was served at a dinner and what events took place at that dinner could influence a jury to disbelieve Jackson's alibi. Id. Hence, in the instant case, Ericksen's claim in her pretrial deposition to have been watching cable when cable service was not in place at appellant's home on the date of the shooting could influence a jury to disbelieve the alibi, particularly when her testimony differed at trial. Similarly, the inconsistencies surrounding where Ericksen tended to appellant and who was in the home also could have affected the jury's decision on the credibility of the alibi.
The majority disagrees with my reliance on Jackson. They assert that the witnesses in Jackson made the facts material by making them a part of their direct testimony. However, appellant made the mundane aspects of the alibi in the instant case material by asking about them on direct examination. When Ericksen took the stand to provide evidence concerning appellant's alibi, she put her credibility in issue, and wide latitude was properly given during cross-examination. See Holmes v. State, 565 So.2d 824 (Fla. 4th DCA 1990), rev. denied, 576 So.2d 287 (Fla. 1991). She put the credibility of appellant's alibi in issue as well.
On direct examination, Ericksen testified that appellant remained in his room the entire day, that she had given some medicine to appellant, and that she had spent the day watching television. On cross examination, the state is allowed to delve into all matters which "may modify, supplement, contradict, rebut or make clearer the facts testified to in chief." Zerquera v. State, 549 So.2d 189, 192 (Fla. 1989) (citations omitted). Hence, it was proper for the state to ask about the cable television, and to follow up on the details of where Ericksen administered the medicine and who was in the house that day. Because these details comprised parts of appellant's alibi defense and were set forth by appellant during Ericksen's direct examination, they were material and the trial court properly allowed the state to present rebuttal evidence in the form of the testimony of other witnesses. See § 90.608(5), Fla. Stat. (1991).[1]
NOTES
[1] Section 90.608, Florida Statutes (1991), provides:

90.608 Who may impeach.  Any party, including the party calling the witness, may attack the credibility of a witness by:
(1) Introducing statements of the witness which are inconsistent with his present testimony.
(2) Showing that the witness is biased.
(3) Attacking the character of the witness in accordance with the provisions of s. 90.609 or s. 90.610.
(4) Showing a defect of capacity, ability, or opportunity in the witness to observe, remember, or recount the matters about which he testified.
(5) Proof by other witnesses that material facts are not as testified to by the witness being impeached.