POLEN, J.
 

 Samantha Holly Wilson appeals the judgment and sentence of the trial court, adjudicating her guilty of attempted child abuse and sentencing her to six months in prison, followed by three years of probation. We reverse Wilson’s conviction because of the improper admission of extrinsic evidence, introduced solely for impeachment on an irrelevant and collateral matter.
 

 Wilson was charged by information with child abuse in violation of section 827.03(l)(b), Florida Statutes. A.K.
 
 [1]
 
 is the child of J.R. and B.K. J.R. and B.K. separated when A.K. was about a year and a half old; the two split visitation. Wilson is B.K.’s girlfriend. There was conflicting testimony adduced at trial. A.K.’s preschool teacher, Ms. White, testified that A.K. was reluctant to go home with Wilson when Wilson first started coming to pick her up from school; that A.K. told her that Wilson locked her in a closet; that A.K. said Wilson pulled her hair;
 
 [2]
 
 and that A.K. told her that Wilson “pulled my ears because I was a bad girl.” White relayed this information to her supervisor, who informed J.R. During cross-examination, White testified that she is friends with J.R. but said they rarely talk. J.R. testified similarly to White. J.R. reported the matter to DCF. B.K. testified that he never let Wilson discipline his daughter and that A.K. never told him Wilson hit her. C.K., B.K’s mother and A.K.’s grandmother, testified that she was friendly with J.R. and Wilson. She never heard A.K. say that Wilson pulled her hair, her ears, or put her in a closet. J.R. further testified
 
 *333
 
 that the only time A.K. mentioned Wilson was to say she missed Wilson or wanted to play with Wilson; B.K. never heard A.K. say anything bad about Wilson.
 

 Wilson testified she picked up A.K. from day care maybe five times by herself. Wilson testified that she and J.R. did not get along very well. Wilson further testified that about four months before this incident, J.R. reported Wilson to DCF, but after an investigation, the case was thrown out. Wilson said that after DCF was called the first time, she made a point not to have A.K. alone as she didn’t want to take the chance of that happening again. Wilson testified that she never noticed the hair problem, but that she and B.K. had noticed bruising on one of A.K.’s ears; A.K. said she fell down and bumped herself on a table. On cross-examination, the following then transpired:
 

 STATE: What about Kristy White? Are you mad at her?
 

 WILSON: I don’t know her.
 

 STATE: Okay. Do you remember a conversation you had with her a few hours ago?
 

 WILSON: Kristy White? I didn’t have a conversation with her a few hours ago.
 

 STATE: Do you remember words that you yelled out at her?
 

 WILSON: I didn’t yell anything out at her.
 

 DEFENSE: Objection, your Honor. She didn’t yell at Kristy White. I think he’s referring to what happened in court. She was telling me it was a different day care [that Xavier attended] when [she] called out to me and said it wasn’t that day care.
 

 STATE: I’ll clarify the question, your Honor.
 

 COURT: All right.
 

 STATE: Do you remember following Kristy White in the parking garage and yelling out that she’s a fucking bitch and a fucking liar?
 

 WILSON: No.
 

 DEFENSE: I would object to that. That’s unsubstantiated and obviously his clients are trying to just, you know, add more to this trial that is—
 

 COURT: I’ll overrule the objection. He just asked the question whether she said it.
 

 STATE: Did you say that?
 

 WILSON: No.
 

 STATE: Okay. And a video from the parking garage wouldn’t show you walking behind her?
 

 WILSON: Me and my boyfriend walked out behind her.
 

 The State re-called White as a rebuttal witness and elicited the following:
 

 STATE: All right. As you were going to lunch, did you have any contact with the defendant?
 

 WHITE: When I was walking to my car, I heard some obscene things being said about me and I happened to turn around and it was Samantha and B.K. and she was—
 

 [[Image here]]
 

 STATE: Okay. What type of things did you hear Samantha yelling?
 

 WHITE: She was saying, she said you’re not J.R.’s, oh, you’re not J.R.’s friend? You’re not J.R.’s friend? You’re a fucking liar. You’re a fucking bitch. And at that time I turned around to see who it was because, to be honest with you I was a little scared, and I turned around and I just kept walking, didn’t make any gestures and I just got to my car.
 

 STATE: Okay. Did it sound like she was angry?
 

 WHITE: Yes.
 

 STATE: Sound like she was upset?
 

 
 *334
 
 WHITE: Yes, sir.
 

 STATE: Lost her temper with you?
 

 WHITE: She was just making obscene language to me and I was kind of scared.
 

 [[Image here]]
 

 STATE: Okay. And after that lunch break I found you and you relayed that story to me?
 

 WHITE: Yes, sir.
 

 The jury found Wilson guilty of the lesser-included offense of attempted child abuse, a third-degree felony. This appeal followed.
 

 Wilson argues that the trial court erred in allowing the State to elicit rebuttal testimony regarding an irrelevant, non-material collateral issue: An alleged verbal confrontation during a trial recess wherein Wilson followed White in the parking lot and yelled obscenities at her because Wilson thought White lied during her testimony. Wilson argues that this prejudicial collateral issue was not one that could support the calling of a rebuttal witness for the purposes of impeachment, and the verbal confrontation was irrelevant to the issues giving rise to the prosecution (whether or not Wilson pulled AK.’s hair out and/or bruised her ears).
 

 The State argues that Wilson’s threats to White during trial were relevant because the evidence tended to show that Wilson had a violent temper, which was relevant to the crime of child abuse, a violent crime. Moreover, the defense in this case was that the victim’s mother, J.R., was vengeful toward Wilson, and White (as a friend of J.R.), had a reason to lie about the abuse suffered by the child. Therefore, the State argues that Wilson’s feelings of anger toward White were relevant, and the rebuttal testimony was proper impeachment of Wilson’s claim that she was not angry with White for testifying against her.
 

 “Relevant evidence is evidence tending to prove or disprove a
 
 material
 
 fact.” § 90.401, Fla. Stat. (2009) (emphasis added). “Any party, including the party calling the witness, may attack the credibility of a witness by ... [pjroof by other witnesses that
 
 material
 
 facts are not as testified to by the witness being impeached.” § 90.608(5), Fla. Stat. (2009) (emphasis added). “In determining if the issue is collateral so that collateral impeachment by extrinsic evidence is disallowed, the question to be posed is whether the impeaching evidence would be admissible for any purpose other than contradiction.”
 
 Correia v. State,
 
 654 So.2d 952, 954 (Fla. 4th DCA 1995) (citing
 
 Dempsey v. Shell Oil Co.,
 
 589 So.2d 373, 377 (Fla. 4th DCA 1991)). “Two types of evidence pass this test: 1) evidence which is relevant to independently prove a material fact or issue; and 2) evidence which would discredit a witness by pointing out the witness’s bias, corruption or lack of competency.”
 
 Id.
 
 (citing
 
 Dempsey,
 
 589 So.2d at 377). “It is well-established that if a party cross-examines a witness concerning a collateral matter, the cross-examiner must ‘take’ the answer, is bound by it, and may not subsequently impeach the witness by introducing extrinsic evidence to contradict the witness on that point.”
 
 Id.
 
 at 955 (citing
 
 Caruso v. State,
 
 645 So.2d 389 (Fla.1994)). However, “[i]n Florida, an exception to the so called collateral-matter rule exists where the collateral extrinsic evidence sought to be introduced concerns matters testified to by the witness on direct examination” because the witness is said to have opened the door.
 
 Mills v. State,
 
 681 So.2d 878, 880 (Fla. 3d DCA 1996) (citing
 
 Segarra v. Mellerson,
 
 675 So.2d 980, 983 (Fla. 3d DCA 1996)).
 

 In
 
 Dupont v. State,
 
 556 So.2d 457 (Fla. 4th DCA 1990), the issue was “whether evidence of an out-of-court verbal confron
 
 *335
 
 tation which occurred during the trial was properly admitted in evidence.”
 
 Id.
 
 at 458. Dupont began to date the victim’s ex-wife.
 
 Id.
 
 Dupont was charged with battery after a fístfíght with the victim, which was witnessed by the victim’s girlfriend.
 
 Id.
 
 On direct examination, Dupont testified that he struck the victim in self-defense.
 
 Id.
 
 On cross-examination, Dupont denied he verbally threatened the victim in an elevator as they departed the courthouse after a trial recess.
 
 Id.
 
 The State presented rebuttal testimony to prove the elevator verbal threat took place.
 
 Id.
 
 On review, this court held that “[t]he elevator verbal threat which happened several months after the fistfight was irrelevant....”
 
 Id.
 
 This court concluded that:
 

 [Dupont] did not put his character trait for violence in issue. Even if he had, opinion testimony is the recognized method of proving character, section 90.405(1), Florida Statutes (1987), and error occurs when the prosecution is allowed to introduce rebuttal evidence of specific acts of violence or turbulence where the defendant only places his or her general reputation for being a peaceful person in issue.
 

 Id.
 
 (citing
 
 Cornelius v. State,
 
 49 So.2d 332, 335 (Fla.1950)).
 

 Whether or not Wilson yelled obscenities at White during a trial recess was not evidence tending to prove or disprove a material fact in the case; the evidence would not tend to prove or disprove that Wilson committed child abuse on A.K. Thus, the evidence was not relevant to the crime charged and did not serve to discredit Wilson by establishing bias, corruption or lack of competency. Moreover, the first question posed to Wilson regarding the incident with White was made by the State on
 
 cross examination;
 
 thus, pursuant to
 
 Mills,
 
 the exception to the collateral matter rule is inapplicable, as Wilson did not open the door to this line of questioning on direct. Under nearly the same factual scenario as here, this court in
 
 Du-pont
 
 held the admission of rebuttal testimony erroneous and harmful error. Accordingly, we hold that the trial court abused its discretion and committed reversible error by allowing the State to elicit rebuttal testimony from White because the testimony concerned a non-material collateral matter. We also find that this error was compounded by the State when, during closing argument,
 
 [3]
 
 the prosecutor improperly focused the jury’s attention on White’s improper rebuttal testimony.
 

 Reversed and Remanded for New Trial.
 

 WARNER, J„ and EHRLICH, MERRILEE, Associate Judge, concur.
 

 [1]
 

 . The child is referred to as "A.K.,” who was two years old when the charges were filed. A.K.'s mother and father are referred to as "J.R.” and "B.K.,” respectively. A.K.'s grandmother is referred to as C.K.
 

 [2]
 

 . White had noticed three big bald spots on A.K.'s head.
 

 [3]
 

 . During the State's closing, the prosecutor argued, in part:
 

 [S]ome of the foggy memories that people had, you know, that the defendant didn’t remember losing her temper and cussing out Kristy White in the parking lot. But she did. The, she, the defendant said, as Kristy White said, she was scared because the defendant sounded angry, sounded mean like she lost her temper and scared her. And Kristy White’s a teacher, a nurse now. She’s not a little two-year-old child like [A.K.] is. Again, the Judge is going to tell you what you're supposed to base your verdict on. That’s the evidence that you heard. And again, accurate memories, people being honest and straightforward up there, testimony agreeing with other testimony, inconsistent statements. Again, you’re going to have to rely on your conclusions about each witness. But I'm confident when you go back there, you’re going to remember the testimony.
 

 Since the proposed rebuttal testimony from Ms. White will not be allowed on retrial, this part of the State’s closing argument similarly will not recur.